THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| CHRISTINA McDONALD, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| v. | : | **No. 5:08-cv-298(CAR)** |
| | : | |
| H & S HOMES, LLC; HORTON HOMES | : | |
| INC.; HORTON INDUSTRIES, INC.; | : | |
| N. DUDLEY HORTON, JR.; STEVE M. | : | |
| SINCLAIR; BEST VALUE HOUSING, INC.; | : | |
| and HORTON-AMERICAN PROPERTIES, | : | |
| LLC. | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

## ORDER REGARDING ATTORNEY-CLIENT PRIVILEGE

Plaintiff seeks to recover a judgment of $500,000.00 awarded to her after years of litigation in an Alabama fraud action against Defendant H & S Homes, LLC.  With accrued post-judgment interest, the judgment is now approaching $800,000.00.  In this case, Plaintiff contends that Defendant engaged in a series of fraudulent transactions in order to evade the judgment.  There have been a number of discovery disputes in this case, including the dispute presently before the Court, in which Plaintiff seeks to obtain discovery of certain attorney-client communications related to the alleged fraudulent transactions.  Plaintiff contends that the "crime-fraud exception" authorizes discovery of these communications.  For the reasons set forth below, the Court agrees.

A.    **The History of the Litigation**

The history of this case is nearly ten years long.  Plaintiff's original fraud claims arose from the purchase of a manufactured home from H & S Homes on January 28, 2000.  She filed suit in the Montgomery Circuit Court on February 26, 2001.  On motion of H & S Homes, Plaintiff's claims

1

were referred to arbitration.  During the course of the litigation, the case was appealed twice, both times resulting in decisions favorable to Plaintiff.  See H & S Homes, L.L.C. v. McDonald, 823 So.2d 627 (Ala. 2001); McDonald v. H & S Homes, L.L.C., 853 So.2d 920 (Ala. 2001).  The arbitrator's award was finally affirmed and made the judgment of the court in a third opinion issued by the Alabama Supreme Court on December 17, 2004.  See H & S Homes, LLC v. McDonald, 910 So.2d 79 (Ala. 2004).

Five years after the Alabama court issued its final decision, the judgment has not been satisfied.  Plaintiff has not received a penny.  H & S Homes maintains that it is insolvent, defunct, and unable to pay.  In the case now pending before this Court, filed on September 8, 2008, Plaintiff alleges that H & S Homes conspired with the other Defendants to evade payment of the judgment by a series of fraudulent transfers that left H & S Homes insolvent and unable to satisfy any part of the judgment.

The path of litigation in this case has proven nearly as tortuous as the path of litigation in the original fraud suit.  Fourteen months after the filing of the case, discovery is still incomplete.  The discovery process has been unusually contentious.  The Court has had to convene a lengthy telephone conference and two subsequent live conferences to address disputes over discovery.  At these conferences, the Court repeatedly compelled Defendants to turn over information that should have been provided in routine discovery responses.  Throughout the discovery process, Defendants have contended that the attorney-client privilege bars discovery of much of the information concerning the purpose and intent of these transactions. The Court does not find Defendants' position credible, and believes that Defendants have engaged in a classic delay strategy in providing discovery materials.

**B.       The Alleged Fraudulent Transactions**

Plaintiff has identified three transactions in particular that Defendants allegedly used or attempted use to empty the coffers of H & S Homes: (1) a lawsuit and default judgment by Horton Homes against H & S Homes, (2) a "Consent Action" to transfer real property to Horton Industries as a "dividend," and (3) the creation of new business entities to take over the business of H & S Homes.  These transactions are described in further detail below.

**1.       The Default Judgment**

One alleged fraudulent transfer involved a default judgment against H & S Homes, in a case filed by Defendant Horton Homes, Inc., the parent corporation and sole member of H & S Homes. Horton Homes filed the suit on  January 4, 2005, less than three weeks after the arbitrator's award against H & S Homes was finally affirmed.  H & S Homes allowed the suit to go into default, and soon afterwards Horton Homes took a default judgment against its subsidiary in the amount of $22,003,000.00.  Although it is undisputed that Horton Homes obtained the default judgment against H & S Homes, the substance of the suit and the reasons for the decision to go into default remain unclear.

**2.       The Consent Action**

A second alleged fraudulent transfer involved a "Consent Action" undertaken or discussed by Defendants in 2006.  Plaintiff contends that in December 2006, Horton Industries, Inc., the parent corporation and 100% owner of Horton Homes, insisted that Horton Homes pay a "dividend" by conveying all of its real property to Horton Industries.  Plaintiff contends that this dividend was a further attempt to deplete or protect assets that should be available to satisfy the judgment. Defendants contend that the Consent Action was never executed and was motivated by unrelated business concerns.  Of the three transactions, the Consent Action is the most difficult to evaluate,

in that it appears that the only information provided to Plaintiff concerning the Consent Action comes from cursory comments in corporate minutes.

### 3.      The Creation of the Triangle Entities

A third alleged fraudulent transfer involved the formation of a new business entity to take over the entire operations of H & S Homes.  Plaintiff alleges that in January 2007, Horton Homes created another wholly-owned subsidiary, Triangle Homes, LLC, to assume the business functions of H & S Homes.  Triangle Homes in turn owned three subsidiaries, Beacon Homes, LLC, New Generation Homes, LLC, and Regal Homes, LLC, which carried on the business formerly pursued by H & S Homes, the marketing and sale of mobile homes produced by Horton Homes.  At the same time, H & S Homes ceased all operations and was left as an empty shell.  It appears to be undisputed that H & S Homes ceased doing business and that the Triangle entities took over the business of H & S Homes.  Nevertheless, Defendants have produced minimal documentation concerning the transition. Defendants' attorneys have maintained in court that they are unable even to determine the date on which the transitions took place or the manner in which the business was transferred.

### C.     The Attorney-Client Privilege and the Crime-Fraud Exception

When pressed for discovery about the purpose and intent of these transactions, Defendants have repeatedly asserted the attorney-client privilege.  Upon review of the arguments of the parties and the record of this case, the Court finds that the attorney-client privilege does not protect this information from discovery.  The information sought by Plaintiff is discoverable under the "crime-fraud exception" to the attorney-client privilege.

The crime-fraud exception applies where communications between a client and an attorney contemplate future crimes or fraud.  Plaintiff has established her right to discovery of attorney-client communications under the crime-fraud exception by making a prima facie showing that the

4

Defendants were engaged in or planning to engage in fraudulent activity when they sought advice from their attorneys regarding these transactions, and that they obtained advice in furtherance of that fraudulent activity.  The prima facie showing in this case arises primarily from the nature of the transactions themselves, as they have the indicia of fraudulent transactions under Georgia's Uniform Fraudulent Transfers Act.  It is also apparent, based on the nature of the transactions and the representations of the parties, that Defendants sought advice from attorneys prior to engaging in these transactions.

The Court recognizes that any inquiry into the communications between an attorney and client is a serious matter, to be undertaken only reluctantly and after careful deliberation.  The attorney-client privilege is an ancient and integral part of the American legal tradition, created "to encourage full and frank communication between attorneys and their clients," and thereby to enable the attorney to act as a fully-informed advocate for the client's interests.  See Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  Both federal and Georgia courts recognize, however, that the attorney-client privilege does not protect communications related to contemplated criminal or fraudulent acts.

The attorney-client privilege is backward-looking, shielding a client's disclosures as to his past activities.  It does not permit a client to engage an attorney for advice in planning future criminal or fraudulent acts.  Courts in the Eleventh Circuit have acknowledged that "[t]he attorney-client privilege does not protect communications made in furtherance of a crime or fraud."  In re Grand Jury Investigation, 842 F.2d 1223, 1226 (11th Cir. 1987).  Georgia courts have likewise found that the attorney-client privilege "extends only to communications after the act or transaction is finished [and] does not cover communications respecting proposed infractions of the law in the

commission of a crime or the perpetration of a fraud." <u>In re Hall County Grand Jury Proceedings</u>, 175 Ga.App. 349, 350 (Ga.Ct.App. 1985). The privilege is a shield, not a sword. <u>Id.</u>

Georgia's law of privilege controls in this case because the case is before the Court under diversity of citizenship jurisdiction and Georgia law governs the resolution of the dispute. Rule 501 of the Federal Rules of Evidence provides that "in civil actions and proceedings with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, state, or political subdivision thereof shall be determined in accordance with State law." In a diversity action, therefore, "state law governs the privileged nature of materials sought in discovery." <u>In re Fink</u>, 876 F.2d 84, 85 (11th Cir. 1989). Although Georgia law governs, the choice of law is ultimately of little consequence in this case. The decisions of the Eleventh Circuit concerning the crime-fraud exception are largely consistent with the holdings of Georgia courts.

Before recognizing an exception to the privilege, courts require an initial showing that a crime or fraud has been committed or contemplated. This showing must be more than a mere allegation of fraud, but need not be conclusive proof. The party seeking disclosure must make a prima facie showing that the communications in question were made in furtherance of illegal or fraudulent activity. <u>See</u> <u>In re Hall County Grand Jury Proceedings</u>, 175 Ga.App. at 351. To support the charge of fraud, therefore, the party must present prima facie evidence that the charge has "some foundation in fact." <u>Atlanta Coca-Cola Bottling Co. v. Goss</u>, 50 Ga.App. 637, 639 (Ga.Ct.App. 1935). In other words, "there must be something to give colour to the charge." <u>Id.</u> Federal courts have similarly required a "prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of

counsel's advice."   In re Grand Jury Investigation (Schroeder), 842 F.2d 1223, 1226 (11th Cir. 1987).

In this case, the undisputed facts are sufficient to give color to the charge that Defendants were engaged in a fraudulent activity when they planned and executed the three transactions identified by Plaintiff.  Defendants do not dispute that they allowed the Horton Homes suit to go into default and that they created the Triangle entities to take over the business of H & S Homes. Defendants contend that the Consent Action was discussed but never executed.   Following these transactions, H & S Homes has been left completely insolvent and unable to pay any part of Plaintiff's judgment. Meanwhile, the overall assets of the Horton family of companies, all completely owned within the structure of Horton Industries and controlled by N. Dudley Horton, Jr., remained untouched.  Defendants have been reluctant to provide more than minimal information regarding these transactions, and have frequently cited the attorney-client privilege in depositions and in written discovery responses, in order to prevent discovery into them.  By their very nature these transactions reek of fraud and appear to be nothing more than an attempt to use the corporate structure to evade payment of a court judgment.  Based on Defendants' frequent invocation of the attorney-client privilege, as well as the application of common sense, it is apparent that attorneys were deeply involved in the planning and execution of each of these transactions.

From what little is known about the three alleged transactions, the Court is able to conclude that there is prima facie evidence of fraudulent activity under the Georgia Uniform Fraudulent Transfers Act, O.C.G.A. § 18-2-70, *et seq*. ("UFTA").  The UFTA provides a creditor with several remedies against a fraudulent transfer, including avoidance of the transfer to the extent necessary to satisfy the creditor's claim and attachment against the asset transferred or other property of the transferee. O.C.G.A. § 18-2-77.  Under the UFTA, a transfer is "fraudulent as to a creditor, whether

the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor."  O.C.G.A. § 18-2-74(a).

In this case as in most fraudulent transfer cases, the Plaintiff's primary challenge is to prove actual intent to hinder, delay, or defraud.  During the course of normal discovery, Defendants have been reluctant to provide significant information as to the purpose and intent of the default judgment and the transfer of business operations to the Triangle entities.  In the various discovery conferences conducted in this case, Defendants have seemed to suggest that these events simply happened, like a change in the weather, without deliberation or direction by any human agency.  Defendants have characterized the Horton Homes lawsuit and subsequent default judgment as merely an "effort to memorialize" a debt between the two companies, so that Horton Homes "could maybe, at least, get some use out of it as a tax loss."  Transcript, July 16, 2009, pp. 3-4 (Doc. 79).  It appears that H & S Homes never even hired counsel to represent it in the case, and it is unclear to the Court whether any part of the judgment was ever paid.  With regard to the Consent Action, Defendants contend that it was only discussed and never finalized.  With regard to the end of H & S Homes' business operations, Defendants have been unable to state with any certainty when or how the transition from H & S Homes to the Triangle entities took place, even after an employee spent three weeks examining the records of the various entities.  See Transcript, Sept. 9, 2009, pp. 43-47 (Doc. 101). See also Transcript, July 16, 2009, pp. 56-58 (Doc. 79).  When asked about the purpose and intent of these transactions, Defendants and defense witnesses have routinely invoked the attorney-client privilege.

The nature of these transactions can by itself be some evidence of their intent.  The UFTA outlines eleven factors that may be considered as indications of actual intent to defraud.  In determining intent, the finder of fact may consider whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

O.C.G.A. § 18-2-74(b).  At least four of these factors are relevant in this case.  One, the transactions or some of the transactions in question were to "insiders" as defined in O.C.G.A. § 18-2-71(7)(B).  Two, before the transactions were undertaken, H & S Homes had been sued.  Three, the transactions and transfers in this case ultimately disposed of all the assets of H & S Homes, as Defendants have consistently maintained that H & S Homes is unable to satisfy even a penny of Plaintiff's judgment.  Four, at least one of the transactions, the default judgment, took place just three weeks after a

substantial obligation was incurred, when the Alabama Supreme Court finally and conclusively affirmed the judgment. These four factors are sufficient to establish a prima facie showing that the transactions were fraudulent in intent and effect.

**D.      The Scope of the Exception in this Case**

Having established a prima facie case that the transactions were fraudulent, Plaintiff is entitled to have additional discovery into the actual intent of the people who participated in the decision to have H & S Homes go into default and to transfer the business activities of H & S Homes to the Triangle entities. The pattern of questionable activity in the wake of Plaintiff's judgment is also sufficient to authorize discovery into the purposes of the Consent Action, whether it was finally entered into or not. The attorney-client privilege will not shield any communications involved in the planning and execution of these transactions.

Although the Court has found that the crime-fraud exception applies in this case, the terms of this Order are limited, and Plaintiff should not interpret it as a broad license to delve into all matters of attorney-client communication or otherwise engage in a "fishing expedition."  As suggested above, the crime-fraud exception is forward-looking.  Accordingly, Plaintiff may inquire into communications between attorney and client only as they are related to the planning or execution of the three transactions described in this Order.  Plaintiff may not inquire into communications made after any of the transactions was carried out, even if those communications concern the possible legal implications of that transaction.  Plaintiff may not inquire into matters unrelated to the planning and execution of these transactions, such as matters related to the defense of this lawsuit or any other lawsuit.

10

1.        **Interrogatory Responses and Depositions**

Plaintiff may therefore conduct additional discovery into matters involving attorney-client privilege, in conformity with the terms and limitations of this Order.  Defendants shall promptly supplement their interrogatory responses to provide responses to any questions regarding the planning and execution of the three transactions discussed above.  Plaintiff may conduct depositions of attorneys and of officers or agents of the Defendants regarding their discussions in the planning and execution of the three transactions, including their purpose and intent, and including proposed alternative approaches.  Any communications that took place prior to or in execution of the transactions will not be shielded by the attorney-client privilege.  If necessary, Plaintiff may reconvene the deposition of any party previously deposed, for the limited purpose of inquiring into matters for which the privilege was raised.

2.        **Documents**

Consistent with the findings above, the Court also finds that a number of documents should be produced over Defendants' objection.  The Court has conducted an in camera review of the documents for which Defendants have raised the attorney-client privilege.  In camera review is warranted where the party opposing the privilege can show "a factual basis adequate to support a good faith belief by a reasonable person that in camera review of the materials may reveal evidence to establish the claim that the crime fraud exception applies."  United States v. Zolin, 491 U.S. 554, 572 (1989).  As outlined above, Plaintiff has established a prima facie case that there were fraudulent transactions, and that attorneys were likely to have participated in the decisions to undertake those transactions.  This evidence provides a sufficient factual basis to support a reasonable belief that some of the withheld documents would include communications related to the

planning and execution of the potentially fraudulent transactions, and in camera review is therefore authorized.

Review of the withheld documents confirms that there are communications related to the planning and execution of the transactions. Although most of the documents listed on the privilege log are irrelevant to the case or are properly protected by the privilege, several of them are related to the creation of the Triangle entities or the Consent Action. Such documents are discoverable under the crime-fraud exception. None of the documents appears to be related to the default judgment.

The most intriguing of these documents is number 22, a letter and memorandum from attorney Sidney Williams to Defendants Dudley Horton and Steve Sinclair. The copy of the letter provided to the Court is dated "August 20, 2009," but this date is clearly erroneous.[1] The second page of the letter shows the date September 1, 2006, and the attached memorandum is dated August 31, 2006. As the letter indicates, the attached memorandum was drafted in response to "several discussions" with Mr. Sinclair "about the prospects for ultimately avoiding the payment of the outstanding judgments held by Cristiana [sic] McDonald, John McDonald and Terry Tindall through normal means." The letter observes that "timing is critical," in that funds held by H & S Homes "could soon be up for grabs in the absence of taking some extraordinary measures."

The attached memorandum outlines six possible "extraordinary measures." The most interesting is Option IV, with the heading "FORM A SUCCESSOR ENTITY AND SUBSTITUTE ITS OPERATIONS FOR H & S." Under the heading of Option IV, the memorandum recommends

---

[1]The Court surmises that this document was stored electronically and printed out on August 20, 2009, during the preparation of the documents for in camera review. Some word-processing programs include a function that will automatically change the date of a letter or other dated document to reflect the date of printing.

that the Horton companies form a completely new entity (described as "NewCo") that would repurchase the inventory of H & S Homes, renegotiate leases, hire former employees, and advertise itself as a new entity.  In a final paragraph, the memorandum sums up the potential benefits and risks of such an approach:

> We should be able to structure an approach which involves the creation and operation of NewCo in such a way as to ultimately avoid successor liability being imposed on NewCo.  A successful structure is fairly complex and will involve many steps which are necessary for both substantive and cosmetic reasons, and which are somewhat awkward from a business standpoint, for example: termination of existing leases and negotiation of new leases for sales lots, rather than assumption of existing leases by NewCo; partial repurchases of manufactured homes by [Horton Homes], and perhaps partial sales of manufactured homes by H & S to NewCo and rehiring of employees by NewCo; devising a way to finance operations of NewCo which will hold up in discovery and will not be subject to attack that NewCo is in substance just another [Horton Homes] owned or controlled entity.

This fourth option is the option that the Horton companies chose. It was executed within four months of the recommendation, with the creation of the Triangle entities in January 2007.

Eight other documents listed in the privilege log appear to concern the planning for the transition from H & S Homes to the Triangle entities.  These documents are numbers 1, 2, 3, 4, 5, 6, 40, and 65.  Two documents, number 13 and number 16, concern the drafting of the settlement agreement.  All these documents shall be produced to Plaintiff.

There appear to be no documents related to the default judgment.  Plaintiff has stated her suspicions that documents 78 and 79 may be pertinent to the lawsuit and default judgment.  These two documents are emails from Sidney Williams to Steve Sinclair dated January 26 and 27, 2005, Despite their dates, shortly after the Horton Homes lawsuit was filed, they are not related to the case. They appear to have no relevance to any issue in this case and will not be produced.

Finally, in a supplement to her brief on the crime-fraud exception (Doc. 98), Plaintiff has stated her concern that Defendants have failed to produce or list in their privilege logs a number of

13

documents from the Chamberlain firm related to the planning of the three transactions.  These documents include billing records for the period between December 2004 to December 2008, interoffice memos and emails concerning the Consent Action or the creation of the Triangle entities, and checks paid by H & S Homes for legal fees from the Chamberlain firm.  Such documents appear to be relevant to Plaintiff's discovery requests.  It is also foreseeable that much of the information in these documents will remain protected by the attorney-client privilege, while other information may be subject to the crime-fraud exception.  To the extent that any such documents exist, therefore, they should be listed in a privilege log and submitted to the Court for in camera inspection consistent with the findings of this Order.

It is SO ORDERED this 23rd day of November, 2009.


S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

chw